IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ADRIAN R. SCOTT
    *Plaintiff*,

    v.

WILLIAM E. LORI, *et al.*,
    *Defendants*.

Civil Action No. ELH-19-2014

**MEMORANDUM OPINION**

Adrian Scott, the self-represented plaintiff, has filed an employment discrimination action against the following defendants:  Archbishop William E. Lori;  the Roman Catholic Archdiocese of Baltimore ("Archdiocese");  Associated Catholic Charities, Inc. ("Catholic Charities");  "Our Daily Bread Employment Center Fund, Inc." ("Daily Bread");[1] Penny Lewis; Patricia Bennett; Mary Ann McCloskey; and Melissa Hafner.  *See* ECF 1 (the "Complaint").  Plaintiff, an African-American male, alleges that he experienced discrimination and retaliation on the basis of race, sex, age, and disability while employed by Catholic Charities from September 2013 to April 2016.  At the time of his termination from employment, Scott was 58 years of age.  ECF 21 at 2.

Summons were executed on September 5, 2019, as to Archbishop Lori, the Archdiocese, Catholic Charities, Daily Bread, and Ms. McCloskey.  ECF 8.[2]  On October 4, 2019, defendants Lori, Catholic Charities, Daily Bread, and McCloskey moved to dismiss the Complaint, pursuant

---

[1] In his "More Definite Statement" (ECF 21), plaintiff identifies the entity as "Our Daily Bread Employment Fund Inc."  In their motion to dismiss, defendants aver that "there is no legal entity named Our Daily Bread Employment Center" and that "Our Daily Bread Employment Center Fund, Inc. is a corporate entity that was formed to solicit donations for Our Daily Bread, a program operated by Catholic Charities."  ECF 24 at 2 n.1.

[2] To date, the docket does not indicate that plaintiff has served Ms. Lewis, Ms. Bennett, or Ms. Hafner.

to Fed. R. Civ. P. 12(b)(6) or, in the alternative, for plaintiff to submit a more definite statement under Fed. R. Civ. P. 12(e).  ECF 15.[3]  Thereafter, plaintiff filed a "More Definite Statement" (ECF 21), which the Court has construed  as an Amended Complaint.  *See* ECF 23; ECF 31.  Eight exhibits are attached to the Amended Complaint.  ECF 21-1 to ECF 21-8.

The Amended Complaint lodges claims under a host of federal statutes as well Maryland law.  Pursuant to federal law, plaintiff alleges race and sex discrimination, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*; age discrimination, in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. § 621, *et seq.*; discrimination on the basis of disability, in violation of the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. § 12101 *et seq.*; race discrimination under 42 U.S.C. §§ 1981 and 1983; violations of the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*; and violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*  ECF 21 at 1-2.  In addition, plaintiff avers that "there are pendent state claims and torts for breach of contract and intentional interference with contract and/or economic advantage."  *Id.* at 2.

Now pending is defendants' motion to dismiss the Amended Complaint, filed by Archbishop Lori, Catholic Charities, Daily Bread, and Ms. McCloskey, pursuant to Fed. R. Civ. P. 12(b)(6).  ECF 24 (the "Motion").  The Motion is supported by four exhibits.  ECF 21 at 24-38.

---

[3] Curiously, the Archdiocese did not respond to the suit.  There is, however, some confusion as to the particular defendants.  Plaintiff's initial Complaint is captioned "Mr. Adrian R. Scott v. Roman Catholic Archdiocese of Baltimore[,] William Lori."  But, Mr. Scott does not identify the Archdiocese as a defendant in the body of the Complaint.  ECF 1 at 2-3.  Nevertheless, summons was executed as to the Archdiocese on September 5, 2019 (ECF 7), and Mr. Scott includes the Archdiocese as a defendant in his Amended Complaint.  ECF 21, ¶ 5.

Mr. Scott's Opposition is docketed at ECF 36.[4]  The Opposition is supported by sixty pages of exhibits.  ECF 36 at 16-76.  Defendants have replied.  ECF 37.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion in part and deny it in part.

## I.    Background[5]

As noted, Mr. Scott is a 61-year-old African-American male.  ECF 21, ¶¶ 3, 13.  He alleges that he worked as a "Job Readiness Instructor" at Catholic Charities in Baltimore from September 2013 until April 20, 2016, when he was terminated.  *Id.* ¶ 15; ECF 24 at 22 (Charge of Discrimination).

According to plaintiff, Archbishop Lori is the "Chief Executive Officer" of the Roman Catholic Archdiocese of Baltimore and is "responsible for management and oversight of" the Archdiocese, Catholic Charities, and Daily Bread.  ECF 21, ¶ 4.  Further, he alleges that the Archdiocese, Catholic Charities, and Daily Bread are "Maryland corporation[s] operating in the State of Maryland . . . ."  *Id.* ¶¶ 5-7.  Ms. Bennett, Ms. Lewis, Ms. McCloskey, and Ms. Hafner are agents or employees of these "Corporate Defendants."  *See id.* ¶¶ 8-11.  At the relevant time, Ms. Lewis served as plaintiff's "direct supervisor," while Ms. McCloskey and Ms. Hafner were "Human Resource supervisor[s]."  *Id.* ¶¶ 10, 11.

---

[4] By Order of February 19, 2020, I directed plaintiff to respond to the Motion by March 2, 2020.  ECF 32.  The Clerk received plaintiff's response via mail on March 2, 2020, but the Opposition was not docketed on CM/ECF until April 24, 2020.  *See Docket*.

[5] As discussed, *infra*, at this juncture I must assume the truth of the facts alleged in the suit.  *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).  Further, the Court may consider documents attached to the Complaint or Motion "so long as they are integral to the complaint and authentic."  *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

Plaintiff alleges that "[s]hortly after being hired" in 2013, he "discovered that the Defendants and their agents exercised a long-standing practice of discrimination, harassment, retaliation, and fraud . . . against its employees and more importantly against individual[s] seeking and participating in the federally funded programs under their care." *Id.* ¶ 16.  The only example plaintiff provides is that Daily Bread allegedly discriminated on the basis of disability in administering its "Christopher Place Employment Academy," *id.* ¶ 18, because one of the requirements for admission to the program was that the applicant "not be consider[ed] disabled by a doctor."  ECF 21-3 (undated recruitment flyer).

Mr. Scott claims that after he "stated his objections to this practice and more importantly refused to participate in the practice, the Defendants' [sic] began targeting [him] through harassment, discrimination, retaliation, disparate treatment, bullying to include false statements degrading his job performance."  ECF 21, ¶ 20; *see id.* ¶ 22.  Plaintiff expressed his concerns to "Sabree Ankyelia," then the Director of Daily Bread, as well as to Ms. McCloskey.  *Id.* ¶ 23.  However, plaintiff alleges that he was "verbally reprimanded" by Ms. Bennett for voicing his concerns and "a portion of that reprimand [was] documented in his initial performance evaluation." *Id.*  Further, Mr. Scott alleges that Ms. Bennett used his performance evaluations "as retaliatory tools and leverage to force his capitulation to engage in illegal conduct."  *Id.* ¶ 24.  In particular, he claims that in 2014 Ms. Bennett generated four versions of his annual performance evaluation, each of which contained false statements.  *Id.*  According to plaintiff, Ms. Bennett "repeated this same contemptible and unprofessional process" for multiple reviews in 2015.  *Id.* ¶ 25.

In June 2014, Ms. Lewis became the Director of Daily Bread.  *See id.* ¶¶ 29, 33.[6]  In that capacity she supervised Ms. Bennett, Mr. Scott's direct supervisor.  *Id.*  In addition, Ms. Lewis supervised Mr. Scott when Ms. Bennett was unavailable.  *Id.*  According to plaintiff, "the demands for [him] to violate Federal anti-discrimination, harassment and retaliation laws etc., increased and intensified" when Ms. Lewis took over Daily Bread.  *Id.* ¶ 30.  Further, plaintiff alleges that Ms. Lewis tried to pressure him into resigning, stating that "'it would be hard for a 58-year-old black male to obtain employment after being fired' or words to that effect."  *Id.* ¶ 32.

Ms. Lewis held her first staff meeting in July 2014.  *Id.* ¶ 33.  During the meeting, Ms. Lewis allegedly stated, *id.*: "'I don't care for men,' 'I don't like men' and 'I don't date men' or words to that effect."  When plaintiff told Ms. Lewis and Ms. Bennett that Ms. Lewis's statements made him uncomfortable, they "suggested he 'get over it or work someplace else' . . . ."  *Id.* ¶ 35.

Plaintiff alleges that between July 2014 and September 2015 he faced "increased pressure" from Ms. Lewis and Ms. Bennett to resign.  *Id.* ¶ 36.  In seeking to force Mr. Scott to quit, Ms. Lewis and Ms. Bennett allegedly "falsified disciplinary writeups [and] falsified annual performance evaluations."  *Id.*  In addition, they made "significant" changes to his duty assignments, disrupted his classroom lessons, denied him training opportunities, and made "verbal assaults" against him.  *Id.*  For instance, Mr. Scott claims that when he brought training opportunities to Ms. Bennett and Ms. Lewis his requests "would be denied but the training [was] offered to his co-workers in and out of his department."  *Id.* ¶ 37.

In September 2015, Scott filed a "defamation complaint against client services manager Charlene Thomas-Christen" with Ms. Bennett.  *Id.* ¶ 41.  In response, plaintiff alleges that Ms.

_____

[6] Plaintiff actually alleges that Ms. Lewis assumed the position in June 2019.  ECF 21, ¶ 29.  However, that date appears to be a mistake.

Bennett "pressured" him to "drop the complaint or face possible termination." *Id.* When Mr. Scott refused to dismiss the complaint, he was called into a meeting with Ms. Lewis and Ms. Bennett. *Id.* During the meeting, Mr. Scott allegedly informed his supervisors that "if they did not want to address his complaint internally, he would file an external complaint with a State or Federal agency." *Id.* At the meeting, Ms. Lewis warned Mr. Scott that they would "deal" with him. *Id.* ¶ 42.

"Almost immediately" after the meeting, Ms. Bennett changed plaintiff's responsibilities to include passing out mail and medication at the Daily Bread's front desk; monitoring the computer area, which was usually unoccupied; and "policing trash and cigarette butts from outside of the building." *Id.* ¶ 43. In contrast, Mr. Scott's female and Caucasian coworkers were not tasked with these duties. *Id.* ¶ 44. When plaintiff asked Ms. Bennett and Ms. Lewis why he was the only one given these additional duties, they told him "it was what 'Corporate wanted.'" *Id.* ¶ 46. Further, Mr. Scott claims that he was "not allowed to engage in several of his primary duties as described in his Job Description," including conducting workshops, meeting with clients, checking homework assignments, or preparing his classroom. *Id.* ¶ 45.

Plaintiff asserts that he filed "several detailed complaints of harassment, discrimination, retaliation, targeting, disparate treatment" against Ms. Bennett and Ms. Lewis in October, November, and December of 2015. *Id.* ¶ 50.[7] However, defendants did not investigate his complaints or provide him with a response. *Id.* ¶ 52.

At unspecified times, plaintiff met with Ms. McClosky and Ms. Hafner, at which they pressured him to drop his complaints. *Id.* ¶ 53. On November 23, 2015, plaintiff met with Ms.

---

[7] In the Amended Complaint, plaintiff cites various dates in 2015, 2016, and 2019. It is clear, however, that Mr. Scott describes a sequence of events that allegedly took place between the fall of 2015 and spring of 2016. ECF 21, ¶¶ 82-90.

Lewis and Ms. McCloskey to discuss his 2015 annual performance evaluation, signed by Ms. Bennett and Ms. Lewis, which Mr. Scott claims was "falsified." *Id.* ¶ 54. According to plaintiff, several incidents of alleged deficient performance that occurred outside the reporting period were included on his 2015 evaluation. *Id.* During the meeting, Ms. McClosky allegedly raised the issue of Mr. Scott's complaints. *Id.* Ultimately, plaintiff alleges that Ms. McClosky directed Ms. Lewis and Ms. Bennett to amend Mr. Scott's evaluation, but did not discipline them. *Id.* ¶ 55.

At about 6:00 a.m. on November 11, 2015, three hours prior to having to report to work, plaintiff called out sick and went to the emergency room, because he was suffering "anxiety and panic attacks due to his hostile work environment." *Id.* ¶ 61. According to plaintiff, defendants require two hours of advance notice to call out sick. *Id.* He suffered another panic attack on November 12, 2015. *See id.* ¶¶ 64, 59. Again, Mr. Scott called out of work at roughly 6:00 a.m., thus satisfying the two-hour advanced notice requirement. *Id.* ¶ 64.

Plaintiff claims that when he returned to work on November 13, 2015, neither Ms. Bennett nor Ms. Lewis indicated that his absences were an issue. *Id.* ¶ 68. However, on December 11, 2015, Ms. Lewis allegedly directed Ms. Bennett to issue a write-up to plaintiff, alleging that he failed to follow "protocol" when he missed work on November 11 and 12, 2015. *Id.* ¶ 59. Plaintiff alleges that "three female co-workers" and the "male Caucasian co-worker in his department" called out sick on short notice but were not disciplined. *Id.* ¶ 66.

According to Mr. Scott, defendants "intensified [their] efforts to create a hostile work environment" throughout the winter and spring of 2016. *Id.* ¶ 70. Plaintiff claims that in "early 2016," Ms. Lewis contacted a former co-worker of Mr. Scott's, "Delia Henry," asking her to "'try to get something on Mr. Scott so we can fire him.'" *Id.* ¶ 49. Further, Mr. Scott alleges that defendants continued to change his job duties, including broadening his recruitment obligations,

"babysitting and cleaning" the computer area, and "visiting various locations through [Maryland] in his privately owned vehicle with no assurance of expense reimbursement . . . ." *Id.* ¶ 70. Plaintiff, who claims that he was classified as an "exempt employee and paid a salary," complains that he was forced to work through his unpaid lunch break, "docked time spent working on the clock," and not compensated for overtime work. *Id.* ¶ 71.

In January 2016, Ms. Lewis and Ms. Bennett signed a revised final 2015 performance evaluation that was "favorable to Mr. Scott." *Id.* ¶ 73. Plaintiff signed the original and returned it to his supervisors so it could be included in his personnel file. *Id.*

Plaintiff claims that his "panic and anxiety attacks increased in frequency and severity," causing him to utilize personal leave sometime during late January 2016. *Id.* ¶ 75. On February 1, 2016, plaintiff claims that Ms. Lewis and Ms. Bennet "prohibited [him] from engaging in instructor duties and turned his class over to his co-worker Cathy McClain, a non-instructor new hire." *Id.* ¶ 76. Instead, plaintiff was directed to monitor the computer lab from 9 a.m. to 12:30 p.m. and to perform recruitment duties. *Id.* Scott did not receive an explanation for the change. *Id.*

Further, plaintiff claims that Ms. Lewis "manufactured a disciplinary write-up" in February 2016, alleging that Mr. Scott failed to return a client's phone call within 24 hours. *Id.* ¶ 77. Plaintiff claims that his "female co-workers and his Caucasian male co-worker on numerous occasions did not return telephone calls within 24 hours but were never written up" by Ms. Lewis. *Id.* ¶ 78. Despite Mr. Scott providing Ms. Lewis with "verifiable proof" that he did in fact return the call, she did not retract the disciplinary write-up. *Id.*

Ms. Lewis interrupted the class that Mr. Scott was teaching on February 29, 2016, and "began verbally assaulting him in front of his students." *Id.* ¶ 82. In particular, Mr. Scott claims

that Ms. Lewis "fuss[ed] and cuss[ed] while stating that she was aware that [he] had filed complaints on her and that he would be terminated once Melissa Hafner arrived later that day." *Id.* This "retaliatory assault" caused Mr. Scott to suffer a severe anxiety attack, requiring him to be transported by ambulance to a hospital. *Id.* ¶ 83.

On March 1, 2016, defendants placed Mr. Scott on "Family Medical leave." *Id.* ¶ 86. Then, on March 3, 2016, Mr. Scott's physician approved him to return to work with instructions not to perform recruiting duties for a month. *Id.* ¶ 88; *see* ECF 21-6 (4/3/2016 medical note). The next day, Mr. Scott returned to work and provided Ms. Lewis, Ms. Hafner, and Ms. McCloskey a copy of the note issued by his doctor. ECF 21, ¶ 89. However, according to plaintiff, before the 9 a.m. staff meeting, Ms. Lewis burst into Mr. Scott's office, where he was meeting with a client, excused the client, and then "went into attack mode . . . cussing and fussing, stating Mr. Scott was not to be at work and that he would be terminated once human resources arrived." *Id.* ¶ 90. Ms. Lewis further instructed Mr. Scott not to teach his class. *Id.*

After Ms. Lewis left Mr. Scott's office, Mr. Scott emailed Ms. Hafner regarding Ms. Lewis's conduct. *Id.* ¶ 92. Later that day, Ms. McCloskey allegedly advised Mr. Scott that Catholic Charities and the Archdiocese "do[] not recognize 'mental illness' as a disability," and therefore he "would in effect have to be one hundred percent well before being allowed to return to duty and must exit the building." *Id.* In response, Mr. Scott "requested a reasonable accommodation to man the computer lab" or perform other job tasks. *Id.* ¶ 93. But, Mr. Scott claims that defendants refused to allow him to perform other duties. *Id.* ¶ 94.

On March 25, 2016, plaintiff filed a complaint with the "Maryland Commission Civil Rights" ("MCCR") and provided defendants with a copy of the complaint. *Id.* ¶ 96. During a meeting on March 30, 2016, Ms. Hafner, Ms. McCloskey, and Ms. Lewis allegedly pressed

plaintiff to drop his complaint and agree not to file further complaints in exchange for a "restoration of his Family Medical Leave and inclusion of a favorable 2015 annual performance evaluation" in his personnel file.  *Id.* ¶ 98.  When plaintiff refused, he was placed on a performance improvement plan.  *Id.*; *see id.* ¶ 97.  According to plaintiff, the improvement plan included duties "completely out of the scope of his areas of expertise . . . ."  *Id.*  ¶ 97.

Plaintiff claims that "Ms. Janitha Morris," a female co-worker "in a one deep position same as [him] under the same supervisors," was "placed on a performance improvement plan for similar if not the same deficiencies contributed [sic] to Mr. Scott."  *Id.* ¶ 101.  However, plaintiff alleges that Ms. Morris was given three months to demonstrate improvement and provided supervision and training, which was not provided to plaintiff.  *See id.* ¶¶ 101-04.  In contrast, Mr. Scott was given only one month and received no support.  *See id.*  On April 20, 2016, less than thirty days after plaintiff was placed on the improvement plan, defendants terminated his employment.  *See id.* ¶¶ 102, 106; ECF 24 at 23.

On November 10, 2016, Mr. Scott filed a Charge of Discrimination with the MCCR.  ECF 24 at 22.  He listed "Catholic Charities" as his employer.  *Id.*  And, as to the basis of the claim of discrimination, he checked the boxes for "Race," "Sex," "Age," "Disability" and "Retaliation." *Id.*  Plaintiff identified the earliest date of discrimination as October 1, 2015, and the most recent incident as April 20, 2016.  *Id.*  In the narrative portion of the Charge, Mr. Scott averred, in part *id.* at 22-23:

> Issue(s): Reasonable Accommodation, Harassment, Hostile Work Environment, Discipline Discharge.
>
> I believe that I was discriminated against based on my age (59 years old), race (African American), sex (Male) and disability as well as retaliated against for opposing discriminatory activity in the workplace because:

I began my employment with the Respondent on September 26, 2013 as a Job Training Instructor. My supervisor was Penny Lewis (Age over 40 years old, Asian, Female, Non-Disabled), Director. My work performance was outstanding.

It should be noted that I currently possess a mental impairment that substantially limits my ability to perform one or more major life activities. On or about March 4, 2016, the Respondent became aware of my disability. However, the Respondent denied my reasonable accommodation request to only perform non-instructional duties.

From on or about October 1, 2015, to April 20, 2016, Ms. Lewis subjected me to discriminatory and retaliatory harassment in the form of, but not limited to, bullying, profanity laced tirades, threatening physical gestures, falsified performance issues, unjustified disciplinary write-ups, and derogatory comments regarding my age, race, sex, and disability. I strongly believe that the Respondent's discriminatory harassment was sufficiently severe and pervasive to interfere with my work performance to create a hostile work environment. During the aforementioned period, I made the Respondent's HR and senior management staff aware of the harassment, however, they failed to take immediate and appropriate corrective action.

In retaliation for opposing unlawful discrimination on April 20, 2016, the Respondent terminated my employment.

On May 24, 2018, following an investigation, the MCCR issued a Written Finding of No Probable Cause. ECF 24 at 25-31. Plaintiff requested reconsideration. But, on August 21, 2018, the MCCR upheld its original finding. ECF 24 at 34. On April 17, 2019, the U.S. Equal Employment Opportunity Commission ("EEOC") adopted the MCCR's findings and issued a Notice of Right to Sue on April 17, 2019. ECF 1-2.

This suit followed on July 15, 2019. ECF 1.

## II.    Standards of Review

### 1.    Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty.*

*Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  Of course, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."  *Johnson v. City of Shelby*, *Miss.*, 574 U.S. 10, 10 (2014) (per curiam).  But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief.  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation.  *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).  If a complaint provides no more than "labels and conclusions" or "a formulaic recitation

of the elements of a cause of action," it is insufficient.  *Twombly*, 550 U.S. at 555.  "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief.  *Iqbal*, 556 U.S. at 678.  Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely."  *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'"  *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015).  However, "a court is not required to accept legal conclusions drawn from the facts."  *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought.  *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'"  *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243).  But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to

13

dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.,* 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.,* 637 F.3d at 448). Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville,* 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert,* 576 U.S. 155 (2015); *see Bosiger v. U.S. Airways,* 510 F.3d 442, 450 (4th Cir. 2007).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.,* 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines,* 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union,* 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC,* 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency,* 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n*

*v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167. Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id.* Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Id.* at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) ) (emphasis in original) (citation omitted); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'"

*Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

As noted, the Amended Complaint is supported by eight exhibits. ECF 21-1 is a document titled "Important Notice to Employees from the Archdiocese of Baltimore About Creditable Prescription Drug Coverage and Medicare," dated October 15, 2014. ECF 21-2 is an undated document that appears to contain a portion of the Archdiocese's Harassment Policy. ECF 21-3 is a flyer for the Christopher Place Employment Academy. ECF 21-4 and ECF 21-5 contain emails between Mr. Scott, Ms. Lewis, Ms. Bennett, and Ms. McCloskey. ECF 21-6 is Mr. Scott's doctor's note, dated March 3, 2016. ECF 21-7 is an email from Ms. Lewis to Mr. Scott, dated February 1, 2016. And, ECF 21-8 is Mr. Scott's performance evaluation for 2014. These documents are referenced in the Amended Complaint. *See, e.g.*, ECF 21, ¶ 18 (referencing the flyer); *id.* ¶ 21 (referencing ECF 21-4); *id.* ¶ 58 referencing ECF 21-5). Therefore, I may consider these exhibits in reviewing the Motion.

The exhibits attached to the Motion include Mr. Scott's Charge of Discrimination, ECF 24 at 22-23; the MCCR's Written Finding, *id.* at 25-32; the MCCR's denial of Mr. Scott's request for reconsideration, *id.* at 34; and the EEOC's Notice of Right to Sue, *id.* at 36-38. In resolving the Motion, I may consider the EEOC materials, as these documents are integral to the suit. *See, e.g.*, *Webb v. Potomac Elec. Power Co.,* TDC-18-3303, 2020 WL 1083402, at *2 (D. Md. Mar. 6, 2020)

("[T]he Court will consider Webb's EEOC Charge, submitted with the Motion, as a document integral to the Amended Complaint because Webb referenced the Charge in the Amended Complaint and he has not objected to its authenticity."); *Evans v. Md. State Hwy. Admin.*, JKB-18-935, 2018 WL 4733159, at *1 n.1 (D. Md. Oct. 2, 2018) (same); *White v. Mortg. Dynamics, Inc.*, 528 F. Supp. 2d 576, 579 (D. Md. 2007) (same).

Plaintiff's Opposition is supported by 60 pages of documents, including emails, Mr. Scott's internal complaints, Mr. Scott's performance review, and his annual performance reviews. Because the performance improvement plan is referenced in plaintiff's Amended Complaint, I may consider it. Likewise, because the email from Mr. Scott to Ms. Hafner regarding Ms. Lewis's conduct on March 4, 2016, is referenced in the Amended Complaint, ECF 21, ¶ 92, I shall consider that email. *See* ECF 36 at 55-56. However, I will not consider the other documents attached to the Opposition, as they are not sufficiently identified and described by plaintiff and are not publicly available materials.

In reviewing the Motion, I am mindful that plaintiff is self-represented. Therefore, his pleadings are "liberally construed" and "held to less stringent standards than [those filed] by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). "However, liberal construction does not absolve Plaintiff from pleading a plausible claim." *Bey v. Shapiro Brown & Alt, LLP*, 997 F. Supp. 2d 310, 314 (D. Md. 2014), *aff'd*, 584 F. App'x 135 (4th Cir. 2014); *see also Coulibaly v. J.P. Morgan Chase Bank, N.A.*, DKC-10-3517, 2011 WL 3476994, at *6 (D. Md. Aug. 8, 2011) ("[E]ven when pro se litigants are involved, the court cannot ignore a clear failure to allege facts that support a viable claim."), *aff'd*, 526 F. App'x 255 (4th Cir. 2013).

Moreover, a federal court may not act as an advocate for a self-represented litigant. *See Brock v. Carroll*, 107 F.3d 241, 242-43 (4th Cir. 1996); *Weller v. Dep't of Soc. Servs.*, 901 F.2d

17

387, 391 (4th Cir. 1990).  Therefore, the court cannot fashion claims for a plaintiff because he is self-represented.  *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985), *cert. denied*, 475 U.S. 1088 (1986); *see also M.D. v. Sch. Bd. of City of Richmond*, 560 F. App'x 199, 203 n.4 (4th Cir. 2014) (rejecting self-represented plaintiff's argument that district court erred in failing to consider an Equal Protection claim, because plaintiff failed to allege it in the complaint).  As the Fourth Circuit has said: "To do so would not only strain judicial resources by requiring those courts to explore exhaustively all potential claims of a pro se plaintiff, but would also transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party."  *Beaudett*, 775 F.2d at 1278.

### 2.  Methods of Proof

Where, as here, a plaintiff has alleged that an employer terminated him on a discriminatory basis, the plaintiff bears the burden of proving his claim by a preponderance of the evidence. In general, there are "two avenues" by which a plaintiff may prove intentional employment discrimination at trial.  Although the methods of proof pertain to trial, these two avenues inform a court's evaluation of a motion to dismiss or for summary judgment.  *See Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019) (recognizing that "a Title VII plaintiff may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas Corp*"); *Pettis v. Nottoway Cty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014) (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas*"); *see also Thomas v. Delmarva Power & Light Co.*, 715 F. App'x 301, 302 (4th Cir. 2018) (per curiam); *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013).

The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'"  *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997).  The plaintiff's second avenue is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g.*, *Young v. United Parcel Serv., Inc.*, 569 U.S. 206, 228-29 (2015) (construing the Pregnancy Discrimination Act); *Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (discussing the *McDonnell Douglas* framework).

The *McDonnell Douglas* proof scheme is "a procedural device, designed only to establish an order of proof and production."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted).  Notably, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination."  *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).  Under the *McDonnell Douglas* approach, the "'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *see also Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 726 (4th Cir. 2019); *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011).

If the plaintiff chooses to proceed *at trial* under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination."  *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Central Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017).  Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against an applicant

"under circumstances which give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253.

If a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle*, 650 F.3d at 336; *see Reeves*, 530 U.S. at 142; *Hurst v. District of Columbia*, 681 F. App'x 186, 189-90 (4th Cir. 2017) (per curiam). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11. The plaintiff must then prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision" and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516-20; *Adams v. Trs. of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

Conversely, if the defendant does not submit evidence of a legitimate basis for its actions, the factfinder may "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978). And, if the defendant fails to meet the burden of producing "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action," then "the

20

court must award judgment to the plaintiff as a matter of law." *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in original). This is because a legal presumption of intentional discrimination has been established. *Id.* at 510 n.3; *see Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

As noted, these two approaches establish the common methods by which a plaintiff may prove intentional employment discrimination *at trial*. *See Burns*, 96 F.3d at 731.  At the motion to dismiss stage, however, a plaintiff need not establish a prima facie case of discrimination under *McDonell Douglas*.  In *Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2002), the Supreme Court explained that the "prima facie case under *McDonnell Douglas* . . .  is an evidentiary standard, not a pleading requirement."  The Court stated that it had "never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss."  *Id.* at 511.  Thus, the Court said: "[A]n employment discrimination plaintiff need not plead a prima facie case of discrimination . . . ."  *Id.* at 515; *see also McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 584 (4th Cir. 2015), *cert. denied*, ___ U.S. ___, 136 S. Ct. 1162 (2016).

However, as the Second Circuit has observed, the Supreme Court's holding in *Swierkiewicz* is arguably in tension with the Court's subsequent rulings in *Iqbal*, 556 U.S. 662, and *Twombly*, 550 U.S. 544.  *See Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015).  On the one hand, "[r]eading *Swierkiewicz* on its face, it appears to have meant that a Title VII plaintiff is not required to plead facts supporting even a minimal inference of discriminatory intent."  *Id*. at 309. On the other hand, in *Twombly*, the Court said that a plaintiff must "state a claim to relief that is

plausible on its face." *Twombly*, 550 U.S. at 570. And, in *Iqbal*, the Court clarified that the heightened pleading standard of Twombly is applicable in "'all civil actions' . . . ." *Iqbal*, 556 U.S. at 684.

In *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017), the Fourth Circuit indicated that although a plaintiff "need not plead facts sufficient to establish a prima facie case of race-based discrimination to survive a motion to dismiss," the "pleading standard established in *Iqbal* and *Twombly* applies[.]" Thus, the question at the motion to dismiss stage is whether the plaintiff has stated "a plausible claim for relief . . . ." *Ciociola v. Balt. City Bd. of Sch. Comm'rs*, CCB-15-1451, 2016 WL 125597, at *4 (D. Md. Jan. 12, 2016).

### III.    The Motion

Defendants contend that the Amended Complaint cannot withstand challenge under Rule 12(b)(6) because "it is devoid of factual allegations that give rise to a cause of action under the statutes and other authorities recited in the pleading." ECF 24 at 3. According to defendants, the claims predicated on the FMLA, FLSA, and § 1983 are time-barred. *Id.* at 8-9. As to plaintiff's ADEA, ADA, Title VII, and § 1981 claims, defendants assert that plaintiff has failed to plead sufficient facts to plausibly allege violations of those statutes. *Id.* at 9-15. Further, defendants maintain that the ADA, the ADEA, and Title VII are not applicable to the individual defendants. *Id.* at 16. As to plaintiff's claims under Maryland law, defendants contend that plaintiff's conclusory assertions of State law violations do not satisfy the "short and plain statement" requirement of Fed. R. Civ. P. 8. *See id.* at 9-10.

### A.  FLSA, FMLA, and § 1983 Claims

In the Amended Complaint, Mr. Scott alleges that defendants' conduct violated the FLSA, the FMLA, and "the Equal Protection Amendment, actionable under 42 U.S.C. § 1983." ECF 21

at 2.  In response, defendants maintain that these claims are time-barred because the statute of limitations for these claims is, at most, three years, and plaintiff did not file his initial Complaint until July 15, 2019—more than three years after he was terminated in April 2016.  *Id.* at 8-9. Moreover, plaintiff's § 1983 claim falters, defendants contend, because plaintiff has failed plausibly to allege state action, a prerequisite for recovery under § 1983.  *Id.* at 9.

The FLSA is " 'best understood as the minimum wage/maximum hour law.'"  *U.S. Dep't of Labor v. Fire & Safety Investigation Consulting Servs., LLC*, 915 F.3d 277, 280 (4th Cir. 2019) (citation omitted).  Enacted in 1938, Congress intended the FLSA "to protect all covered workers from substandard wages and oppressive working hours[.]"  *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981); *see Encino Motorcars, LLC v. Navarro*, ___ U.S. ___ 136 S. Ct. 2117, 2121 (2016); *Fire & Safety Investigation*, 915 F.3d at 280; *Morrison v. Cty. of Fairfax*, 826 F.3d 758, 761 (4th Cir. 2016).  To that end, the FLSA provides that "no employer shall employ" a covered employee in excess of 40 hours in a given week unless the employee is paid at "a rate not less than one and one-half times the regular rate at which he is employed" for each additional hour worked.  29 U.S.C. § 207(a)(1); *see Encino Motorcars*, 136 S. Ct. at 2121; *Fire & Safety Investigation*, 915 F.3d at 280; *Harhourt v. PPE Casino Resorts Md., LLC*, 820 F.3d 655, 658 (4th Cir. 2016).

Whereas the FLSA is designed to protect employees' pay, the FMLA serves to ensure that employees can take leave for personal or family medical reasons.  Under the FMLA, certain employees may take a total of "12 workweeks of leave" during a twelve-month period, for family-related reasons or because of an employee's "serious health condition" that makes the employee "unable to perform the functions of" his job. 29 U.S.C. § 2612(a)(1)(D); *see Fry v. Rand Construction Corp.*, ___ F.3d ___, 2020 WL 35506889, at *4 (4th Cir. July 1, 2020).  In addition,

the FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1).

Notably, § 2615 "prohibits two kinds of conduct[.]" *Fry*, 2020 WL 3550689, at *4. First, "an employer cannot 'interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this Subchapter.'" *Id.* (citing § 2615(a)(1)). Second, "an employer cannot 'discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this Subchapter.'" *Id.* (citing § 2615(a)(2)). As the *Fry* Court has explained, "[t]he first prohibition gives rise to 'interference' or 'entitlement claims.'" *Id.* (citation omitted) (cleaned up). And, "[t]he second prohibits retaliation or discrimination for opposing unlawful practices." *Id.*

Both the FLSA and the FMLA ordinarily require a plaintiff to file suit within two years of the alleged unlawful conduct. *See* 29 U.S.C. § 255(a) (FLSA); 29 U.S.C. § 2617(c) (FMLA). Where the defendant's illegal conduct was "willful," the FLSA and FMLA extend the statute of limitations period to three years. *See* 29 U.S.C. § 255(a) (FLSA); 29 U.S.C. § 2617(c)(2) (FMLA). Here, even assuming that plaintiff has plausibly alleged that defendants willfully violated the FLSA and FMLA, the last possible date on which the plaintiff's FLSA and FMLA claims could have accrued was the date of his termination, April 20, 2016. ECF 21, ¶ 14; *see* ECF 24 at 23. However, he did not initiate this action until July 2019, more than three years later. ECF 1. Accordingly, plaintiff's claims under those statutes are time-barred. Therefore, I shall dismiss plaintiff's FLSA and FMLA claims, with prejudice. *See, e.g.*, *Marley v. Donahue*, 133 F. Supp. 3d 706, 720 (D. NJ. 2015) (dismissing FMLA claims as time-barred); *Bilal-Edwards v. united Planning Org.*, 15 F. Supp. 3d 1, 17 (D.D.C. 2013) (dismissing FLSA claims as time-barred).

For the same reason, plaintiff's § 1983 claim is subject to dismissal.  Although there is no federal statute of limitations for actions under § 1983, it is well settled that the limitations period for a § 1983 claim is determined based on the analogous state law statute of limitations. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007); *Burnett v. Grattan*, 468 U.S. 42, 49 (1984).  In Maryland, the applicable statute of limitations is three years from the date of the occurrence.  *See* Md. Code (2013 Repl. Vol.), § 5-101 of the Courts and Judicial Proceedings Article.  Plaintiff's § 1983 claim was filed more than three year after his termination.  Therefore, it is untimely.  It follows that plaintiff's § 1983 claim is subject to dismissal, with prejudice.

## B.  ADEA Claim

Congress enacted the ADEA in 1967 "'to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment.'" *EEOC v. Balt. Cty.*, 904 F.3d 330, 333-34 (4th Cir. 2018) (quoting 29 U.S.C. § 621(b) ) (alteration in *EEOC* ).  The statute makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1); *see Hartman v. Univ. of Md. at Balt.*, 595 F. App'x 179, 181 (4th Cir. 2014) (per curiam); *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009).  The ADEA's protections are "limited to individuals who are at least 40 years of age." 29 U.S.C. § 631(a).  Plaintiff, who was older than 40 when he worked at Catholic Charities, was within the ADEA's protection at all relevant times.

To state a claim of employment discrimination under the ADEA through the *McDonnell Douglas* framework, a plaintiff must allege: "(1) the plaintiff was over 40 years of age at the

relevant time; (2) he was performing his job duties satisfactorily; (3) he was nevertheless subjected to an adverse employment action; and (4) substantially younger individuals with comparable qualifications were treated more favorably. *See Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 725 (4th Cir. 2019); *Bodkin v. Town of Strasburg*, 386 F. App'x 411, 413-14 (4th Cir. 2010); *see also* 29 U.S.C. § 623(a).

The Supreme Court has ruled that, unlike Title VII, the ADEA does not permit "a mixed-motives age discrimination claim." *Gross v. FBL Fin. Servs., Inc*., 557 U.S. 167, 175 (2009). Rather, given that ADEA liability hinges on discrimination "*because* of . . . age," 29 U.S.C. § 623(a)(1) (emphasis added), the plaintiff must "establish that age was the 'but-for' cause of the employer's adverse action." *Gross*, 557 U.S. at 177; *see also Hartman*, 595 F. App'x at 181.

Of course, a plaintiff does not need to establish a prima facie case of discrimination at the motion to dismiss stage. *See Swierkiewicz*, 534 U.S. at 511; *accord Buchanan v. Delta Air Lines, Inc*., 727 F. App'x 639, 641 (11th Cir. 2018) (per curiam) (applying *Swierkiewicz* to ADEA claim). That said, a complaint must still put forth sufficient factual allegations to "support a reasonable inference that the decisionmakers were motivated by bias." *McCleary-Evans*, 780 F.3d at 586; *see also Swierkiewicz*, 534 U.S. at 511.

Generously construing the Amended Complaint's allegations in plaintiff's favor, they do not state a claim under the ADEA. To be sure, plaintiff adequately alleges that he falls within the sweep of the ADEA. *See* ECF 21, ¶ 3 (alleging that plaintiff was 58 at the time of his termination). Significantly, however, though, there are no allegations in the Amended Complaint that younger employees were treated more favorably than plaintiff. *Compare Smith v. Potomac Elec. Power Co*., TDC-19-1764, 2020 WL 1904707, at *4-5 (D. Md. Apr. 17, 2020). Indeed, the only allegation concerning plaintiff's age is that Ms. Lewis once advised that "it would be hard for a 58-year old

black male to obtain employment after being fired." ECF 21, ¶ 32. But, this lone remark does not give rise to the inference that Ms. Lewis's conduct towards Mr. Scott between 2014 and 2016 was because of Mr. Scott's age. *Compare Baqir v. Principi*, 434 F.3d 733, 734-35, 744-45 (4th Cir. 2006) (inferring actionable age-based animus against a 60-year-old interventional cardiologist based on the statement that "interventional cardiology is meant for people in their thirties"). And, regarding plaintiff's termination, the Amended Complaint does not allege that he was replaced by a person who is "substantially younger." *Bodkin*, 386 F. App'x at 414.

In sum, there are no factual allegations in the Amended Complaint to support the inference that Mr. Scott experienced discrimination because of his age. Thus, I shall dismiss his ADEA claim against Catholic Charities and Daily Bread, *without prejudice*. *See, e.g.*, *Freeman v. Beverly*, PX-19-1784, 2020 WL 2747392, at *5-6 (D. Md. May 27, 2020). However, because the ADEA does not permit an action against individuals who are not the plaintiff's employer, *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510 (4th Cir. 1999), I shall dismiss plaintiff's ADEA claim *with prejudice* to the extent that it is lodged against the individual defendants.

### C. ADA Claim

The ADA, 42 U.S.C. § 12101 *et seq.*, was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." *Id.* § 12101(b)(1), (b)(2). To that end, the statute "prohibits discrimination against persons with disabilities in three major areas of public life: employment, under Title I, 42 U.S.C. §§ 12111–12117; public services, under Title II, 42 U.S.C. §§ 12131-12165; and public accommodations, under Title III, 42 U.S.C. §§ 12182-12189." *A Helping Hand,*

*LLC v. Baltimore County*, 515 F.3d 356, 361 (4th Cir. 2008) (citing *Tennessee v. Lane*, 541 U.S. 509, 516-17 (2004)).

Of relevance here, Title I prohibits employment discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 328 (4th Cir. 2014) ("The ADA makes it unlawful for covered employers to 'discriminate against a qualified individual on the basis of disability.'"). A "qualified individual" is defined in the ADA as a person who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A disability is defined as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]" *Id.* § 12102(1); *see Gentry v. E. W. Partners Club Mgmt. Co.*, 816 F.3d 228, 239 (4th Cir. 2016) (quoting 29 C.F.R. § 1630.2(k)(1)). Major life activities include, but are not limited to, "sleeping, walking, standing, lifting, bending . . . working" and "reproductive functions." 42 U.S.C. § 12102(2)(A)-(B). An individual with a "a record of such an impairment," or who is "regarded as having such an impairment," will be considered to have a disability. *Id.* § 12102(1)(B)-(C).

Under Title I of the ADA, "discrimination against a qualified individual on the basis of disability" includes "denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(B). Likewise, the ADA bars the discharge of a qualified employee because she is disabled. *Summers*, 740 F.3d at 328. In addition, discrimination under the ADA includes "not making reasonable accommodations to the

known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer.]"  *Id.* § 12112(b)(5)(A); *see Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 344 (4th Cir. 2013).

A reasonable accommodation "is one that 'enables a qualified individual with a disability to perform the essential functions of a position.'"  *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 580 (4th Cir. 2015) (quoting 29 C.F.R. § 1630.2(o ) (1)(ii)); *see also Hamel v. Bd. of Educ. of Harford Cty.*, JKB-16-2876, 2018 WL 1453335, at *10 (D. Md. Mar. 23, 2018).  Thus, once an employer has notice of an employee's disability, the employer has "a good-faith duty 'to engage [with the employee] in an interactive process to identify a reasonable accommodation.'"  *Jacobs*, 780 F.3d at 581 (alteration in *Jacobs*) (quoting *Wilson*, 717 F.3d at 346).  That said, an accommodation is not reasonable as a matter of law "if it either imposes undue financial and administrative burdens on a grantee, or requires a fundamental alteration in the nature of [the] program."  *Sch. Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 288 (1987) (internal citations omitted); *see Reyazuddin v. Montgomery Cty.*, 789 F.3d 407, 414 (4th Cir. 2015); *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 464 (4th Cir. 2012).

Mr. Scott frames his ADA claim as one for failure-to-accommodate.  *See* ECF 21, ¶¶ 93-94 (claiming that defendants "refused to provide Mr. Scott with reasonable accommodations"); ECF 24 at 22 (Mr. Scott alleging in his Charge of Discrimination that defendants "denied my reasonable accommodation request").  To state a claim for failure-to-accommodate under the ADA, the plaintiff must plausibly allege: "'(1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position; and (4) that

the employer refused to make such accommodations.'"  *Wilson*, 717 F.3d at 345 (cleaned up and

citation omitted); *see also Sprague v. N. Va. Criminal Justice Training Acad.*, 794 F. App'x 314,

314 (4th Cir. 2020); *Stephenson v. Pfizer, Inc.*, 641 F. App'x 214, 219 (4th Cir. 2016).

Assuming, *arguendo*, that plaintiff has plausibly alleged that his panic attacks render him

disabled under the ADA, his ADA claim nonetheless falters on the third element—whether he

could perform essential functions of his job if provided reasonable accommodations.  That is so

because the Amended Complaint is devoid of any allegations concerning plaintiff's job

responsibilities.  Indeed, although Mr. Scott generally refers to "fifteen essential functions stated

in his job description," ECF 21, ¶ 93, those functions are never specified in the Amended

Complaint.  Without any description of what plaintiff's job entails, it is merely conceivable—as

opposed to plausible—that Mr. Scott's request to "man the computer lab" or "assist at the front

desk and assist clients with placements," *id.*, were reasonable accommodations, given his

disability.  *See Rubino v. New Acton Mobile Indus., LLC*, 44 F. Supp. 3d 616, 623 (D. Md. 2014)

(plaintiff failed to state an ADA accommodation claim because it was "not possible to tell from

the Amended Complaint what the Plaintiff's job involves"); *see also Jeffries v. Wal-Mart Stores*

*E.*,  GJH-15-473, 2016 WL 3771241, at *4 (D. Md. July 11, 2016); *Young v. Giant Food Stores,*

*LLC*, 108 F. Supp. 3d 301, 318 (D. Md. 2015).

Therefore, plaintiff's ADA claim is subject to dismissal.   However, I shall dismiss

plaintiff's ADA claim against Catholic Charities and Daily Bread *without prejudice*, because the

identified pleading defects are curable.  *See Adams v. Sw. Va. Reg'l Jail Auth.*, 524 F. App'x 899,

900 (4th Cir. 2013).  But, because the ADA does not permit an action against individuals who are

not the plaintiff's employer, *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 472 (4th Cir. 1999), I shall

dismiss plaintiff's ADA claim *with prejudice* to the extent that it is lodged against the individual defendants.

### D.  Title VII Claims

### 1.  Title VII Generally

Title VII prohibits an employer, *inter alia*, from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2.  The phrase "terms, conditions or privileges of employment" is "an expansive concept."  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) (quotation marks and citation omitted).  Title VII also bars retaliation based on an employee's opposition to conduct made unlawful by Title VII, or for participation in a Title VII investigation or proceeding.  42 U.S.C. § 2000e-3; *see e.g.*, *Evans v. Int'l Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019); *Ray v. Int'l Paper Co.*, 909 F.3d 661, 666 (4th Cir. 2018); *Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018); *Strothers v. City of Laurel*, 895 F. 3d 317, 326-27 (4th Cir. 2018); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en banc); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014).

Before filing suit under Title VII, a plaintiff must exhaust administrative remedies.  *See Patterson v. McLean Credit Union*, 491 U.S. 164, 181 (1989) (private sector employees), *superseded on other grounds by* 42 U.S.C. § 1981(b); *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 832 (1976) (federal employees).  Exhaustion under Title VII is not jurisdictional; it is a "claim-processing rule[] that must be timely raised to come into play."  *Fort Bend Cty. v. Davis*, ___ U.S. ___, 139 S. Ct. 1843, 1846, 1850 (2019).

### 2.   The Individual Defendants

As a threshold matter, "supervisors are not liable in their individual capacities for Title VII violations." *Lissau v. S. Food Serv., Inc*., 159 F.3d 177, 180 (4th Cir. 1998); *see Abeles v. Metro Wash. Airport Auth*., 676 F. App'x 170, 176-77 (4th Cir. 2017); *Spell v. Wright*, RBD-19-722, 2020 WL 247460, at *3 (D. Md. Jan. 16, 2020) (dismissing Title VII claims against employees). Rather, only an employer may be held liable for Title VII violations because individual liability under Title VII "would improperly expand the remedial scheme crafted by Congress." *Lissau*, 159 F.3d at 181.

Plaintiff does not allege that he was employed by Archbishop Lori or Ms. McCloskey. Indeed, in his Charge of Discrimination, he identified Catholic Charities as his employer.  ECF 25 at 23.  Therefore, to the extent that plaintiff lodges Title VII claims against Archbishop Lori and Ms. McCloskey, those claims are subject to dismissal, with prejudice.

### 3.   Discrimination

Plaintiff alleges that he was subject to discrimination on the basis of his sex and race, in violation of Title VII.  Defendants move to dismiss these claims, asserting that Mr. Scott has failed to plead sufficient facts "that give rise to a reasonable inference of unlawful discrimination . . . ." ECF 24 at 13.

To state a claim of race or sex discrimination under *McDonnell Douglas*, the plaintiff must allege "'(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class.'"  *Goode v. Cent. Va. Legal Aid Soc*., Inc., 807 F.3d 619, 626 (4th Cir. 2015) (citation omitted) (race discrimination); *see also Matias v. Elon Univ.*, 780 F. App'x 28, 31 (4th Cir. 2019) (per curiam) (race discrimination); *Dortch v. Cello P'ship*, 770 F. App'x 643, 646 (4th

Cir. 2019) (sex discrimination).

It appears that plaintiff attempts to state claims for disparate treatment under *McDonnell Douglas*.  For one thing, the Amended Complaint does not allege facts of explicit sexual or racial hostility.  Additionally, plaintiff repeatedly compares himself to white and female coworkers.  *See* ECF 21, ¶¶ 44, 66, 101-04, 106.

For example, Mr. Scott alleges that Ms. Bennett and Ms. Lewis denied him job training opportunities but then offered them to "his co-workers in and out of his department."  *Id.* ¶ 37. Plaintiff claims that his duties were changed to include tasks such as staffing the front desk and monitoring the computer area, yet "several females and a Caucasian male employee . . . was not tasked with any of these 'add on' duties." *Id.* ¶ 44.  Mr. Scott also asserts that Ms. Lewis and Ms. Bennett issued a disciplinary write-up to him because he called out sick on short notice, and because he failed to return a client phone call within 24 hours, but his "female co-workers and his Caucasian male co-worker" were not disciplined for similar conduct.  *Id.* ¶¶ 66, 78; *see also id.* ¶¶ 69, 77.

As an African-American male, plaintiff is plainly a member of a protected class under Title VII.  However, the Amended Complaint does not adequately plead facts to support the inference that an adverse employment action took place because of his race or sex.  It follows that plaintiff has not alleged a plausible discrimination claim.

To start, with the exception of plaintiff's placement on a performance improvement plan that led to his termination, defendants' alleged conduct does not rise to the level of an actionable adverse employment action. An adverse employment action "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle,* 650 F.3d

at 337 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).  In other words, the action must "'adversely affect[] the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Wash. Homes*, *Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (quoting *James v. Booz-Allen & Hamilton, Inc*., 368 F.3d 371, 375 (4th Cir. 2004)); *see Boone v. Goldin*, 178 F.3d 253, 256-57 (4th Cir. 1999) ("[A]bsent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position.").  Thus, "[a]n action that merely causes an employee irritation or inconvenience, but does not affect a term, condition, or benefit of her employment, is not an adverse employment action."  S*priggs v. Pub. Serv. Comm'n of Md.*, 197 F. Supp. 2d 388, 393 (D. Md. 2002).

None of the allegations referenced above constitutes an adverse employment action.  The Fourth Circuit has instructed that reprimands and poor performance reviews, without more, do not constitute an adverse employment action.  *See Dortch v. Cellco Partnership*, 770 F. App'x 643, 647 (4th Cir. 2019) (per curiam) (reiterating that "'a poor performance evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the receipient's employment.'") (citation omitted); *Adams v. Anne Arundel Cty. Pub. Schs*., 789 F.3d 422, 431 (4th Cir. 2015) (concluding that, for the purposes of a Family Medical Leave Act claim, "neither the written nor the verbal reprimands qualify as adverse employment actions, because they did not lead to further discipline"); *Munday v. Waste Mgmt. of N. Am., Inc*., 126 F.3d 239, 244 (4th Cir. 1997) (holding that an employer's "yelling at [the plaintiff] during [a] meeting" did not rise to the level of an adverse employment action for Title VII purposes); *Finnegan v. Dep't of Pub. Safety & Corr. Servs*., 184 F. Supp. 2d 457, 461 (D. Md.

2002) ("[D]iscipline, without evidence that the verbal reprimands or that a counseling letter could lead to further disciplinary action, such as termination, does not constitute an adverse employment action."). Similarly, reassignments or changes to the employee's job responsibilities are not materially adverse unless they have a "'significant detrimental effect' on his opportunities for promotion or professional development." *James*, 368 F.3d at 376 (citation omitted); *see id.* (concluding that an employee's dissatisfaction with a reassignment is not an actionable adverse action); *Boone*, 178 F.3d at 255-56; *Taylor v. Burwell*, No. 13-cv-1998-PWG, 2014 WL 3547337, at *6 (D. Md. Jul. 16, 2014) ("[T]emporary changes to an employee's workload or to the tasks he is assigned do not constitute an adverse employment action."). Indeed, work would grind to a halt if every employee saddled with a new task or project could sue under Title VII. *See Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985) ("Every job has its frustrations, challenges and disappointments; these inhere in the nature of work.").

In contrast, plaintiff's alleged placement on a performance improvement plan does qualify as an adverse employment action because it resulted in his termination. Plaintiff claims that he was placed on a performance improvement plan during a meeting held on March 30, 2016, with Ms. McCloskey, Ms. Hafner, and Ms. Lewis. ECF 21, ¶¶ 98-99. But, less than thirty days later, Mr. Scott was allegedly terminated from Catholic Charities, on the ground that he "failed to meet the requirements" of the performance improvement plan. *Id.* ¶ 102. Because plaintiff alleges his termination followed from the performance improvement plan, the plan and the resulting termination qualify as adverse employment actions. *See James*, 368 F.3d at 377; *compare Jensen-Graf v. Chesapeake Employer's Ins. Co.*, 616 F. App'x 596, 598 (4th Cir. 2015); *Fletcher v. Ross*, TDC-17- 3419, 2018 WL 6031173, at *5 (D. Md. Nov. 16, 2018).

Nonetheless, plaintiff's alleged placement on a performance improvement plan does not

support a plausible discrimination claim because the Amended Complaint does not plausibly allege that defendants were motivated by discriminatory intent.  Although a complaint need not plead facts sufficient to establish a prima facie case of discrimination, it must put forth facts to support a plausible inference of disparate treatment.  *Woods*, 855 F.3d at 648; *McCleary-Evans*, 780 F.3d at 585-88.  Stated differently, a plaintiff is "not required as a matter of law to point to a similarly situated comparator to succeed on a discrimination claim." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010), *cert. denied*, 562 U.S. 1219 (2011); *see Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 545-46 (4th Cir. 2003).  But, "[w]here a plaintiff attempts to rely on comparator evidence to establish circumstances giving rise to an inference of unlawful discrimination," the plaintiff must demonstrate that the comparator is similarly situated in all relevant respects.  *Swaso v. Onslow Cty. Bd. of Educ.*, 698 F. App'x 745, 748 (4th Cir. 2017); *see Irani v. Palmetto Health*, 767 F. App'x 399, 420 (4th Cir. 2019) (per curiam); *Haywood*, 387 F. App'x at 359; *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008).

As indicated, plaintiff asserts claims of disparate treatment.  Therefore, he must allege facts showing that he is "similar in all relevant respects to his comparator," including "that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'"  *Haywood*, 387 F. App'x at 359 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)); *see Sawyers v. United Parcel Serv.*, 946 F. Supp. 2d 432, 442 n.10 (D. Md. 2013), *aff'd*, 576 F. App'x 199 (4th Cir. 2014).

Of course, the comparison "'will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same set of circumstances.'"

*Haynes*, 922 F.3d at 223-24 (citation omitted); *see Irani*, 767 F. App'x at 420. Nevertheless, "[i]f a plaintiff wishes to prove that a defendant's legitimate, non-discriminatory explanation is pretext by pointing to other employees who were treated differently, '[t]he similarity between comparators . . . must be clearly established in order to be meaningful.'" *Swaso*, 698 F. App'x at 748 (citation omitted); *see, e.g.*, *Lightner*, 545 F.3d at 265 (rejecting comparison evidence as "too loose"). Thus, a complaint's conclusory assertions that the plaintiff and a co-worker are on equal footing is insufficient to nudge a discrimination claim across the line from conceivable to plausible. *See Swaso*, 698 F. App'x at 748; *Sanchez v. Whole Foods Mkt.*, GJH-18-3106, 2019 WL 3717771, at *4 (D. Md. Aug. 5, 2019); *Bowen v. Md. Dept. of Pub. Safety & Corr. Servs.*, RBD-17-1571, 2018 WL 1784463, at *10 (D. Md. Apr. 12, 2018).

Mr. Scott relies on comparator evidence in claiming that defendants' administration of his performance improvement plan was discriminatory. Specifically, the Amended Complaint alleges that "Janitha Morris, a female co-worker . . . in a one deep position same as Mr. Scott under the same supervisors" was placed on an improvement plan "for similar if not the same deficiencies" attributed to Mr. Scott. ECF 21, ¶ 101. Ms. Morris was allegedly given three months to demonstrate compliance with the plan and was provided "enhanced supervision, training and mentoring." *Id.* ¶ 101. In contrast, Mr. Scott was fired after only thirty days on the plan, and he was "denied training, denied enhance[d] supervision, denied mentoring, denied policies, procedures, guidelines and memorandum of understanding" as well as "information as to the Federally Funded Grant goals and outcomes he was expected to meet." *Id.* ¶ 102.

These allegations do not permit the inference that Ms. Morris and Mr. Scott were similarly situated. Notably, the Amended Complaint does not specify Ms. Morris's race. Without that critical factual allegation, the Court cannot plausibly infer that defendants treated Ms. Morris and

Mr. Scott differently due to their race.  In addition, although the Amended Complaint alleges that Mr. Scott and Ms. Morris had the same supervisors, there are no averments concerning Ms. Morris's work history, qualifications, and responsibilities.  Yet, these allegations are necessary to show that Mr. Scott and Ms. Morris were similarly situated.  For instance, the Amended Complaint alleges that Mr. Scott and Ms. Morris were placed on improvement plans for "similar if not the same deficiencies," but is silent as to whether Ms. Morris had a disciplinary record similar to Mr. Scott's.  *See Irani*, 767 F. App'x at 420 (plaintiff's comparators were not sufficiently similar because they did not have comparable disciplinary histories).  Absent allegations that plaintiff and Ms. Morris were similarly situated in all relevant respects, only speculation can "fill the gaps in [his] complaint." *McCleary-Evans*, 780 F.3d at 587

Therefore, I shall dismiss plaintiff's sex and race discrimination claims, *without prejudice*.

### 4.  Retaliation

To state a claim of retaliation under Title VII, a plaintiff must allege: "(1) that he engaged in protected activity, (2) that the employer took a materially adverse action against him and (3) there is a causal connection between the protected activity and the adverse action." *Perkins*, 936 F.3d at 213; *see Strothers*, 895 F.3d at 327; *Smyth-Riding v. Sci. Eng'g Servs., LLC*, 699 F. App'x 146, 151 (4th Cir. 2017); *Okoli v. City of Balt.*, 648 F.3d 216, 223 (4th Cir. 2011); *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005).  The plaintiff must establish retaliation, either by direct evidence "or by proving that any non-retaliatory justification for the [adverse action] was pretextual." *Netter*, 908 F.3d at 938; *see Foster v. Univ. of Md.- E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015).

As indicated, a plaintiff must first allege that he engaged in protected activity.  The Fourth Circuit has explained that, "in the context of a retaliation claim, a 'protected activity' may fall into

two categories, opposition and participation." *Navy Fed. Credit Union*, 424 F.3d at 406; *see Netter*, 908 F.3d at 937.  "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin v. Metro. Wash. Airport Auth.*, 149 F.3d 253, 259 (4th Cir. 1998).

The second element is that of an "adverse action."  In *Strothers*, 895 F.3d at 327, the Fourth Circuit explained that an "adverse *employment* action" is not the standard in a retaliation case. (Emphasis added.)  In a retaliation claim, the standard for an adverse action is more expansive than for a substantive discrimination claim.  *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("*Burlington Northern*") ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.").  Therefore, the adverse action "need not be employment or workplace-related in order to sustain a retaliation claim."  *Strothers*, 895 F.3d at 327.

However, Title VII does not serve as "'a general civility code for the American workplace.'"  *Id.* at 68 (citation omitted).  Thus, it "does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'"  *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington Northern*, 548 U.S. at 68).  Nor does "a personal conflict alone . . . constitute retaliation."  *Spencer v. Va. State Univ.*, 919 F.3d 199, 208 (4th Cir. 2019).  Rather, to qualify as a materially adverse action in the retaliation context, the plaintiff must show that the defendant's action "'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Burlington Northern*, 548 U.S. at 68 (citation omitted); *see Evans*, 936 F.3d at 195; *Hoyle*, 650 F.3d at 337.  And, "there must be 'some direct or indirect

impact on an individual's employment as opposed to harms immaterially related to it.'" *Ray*, 909

F.3d at 670 (quoting *Adams*, 789 F.3d at 431; *see Burlington Northern*, 548 U.S. at 67.

The Fourth Circuit has found that "discharge, demotion, decrease in pay or benefits, loss

of job title or supervisory responsibility, or reduced opportunities for promotion" constitute

adverse actions. *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999). The reassignment of job

functions may also constitute an adverse action. *Young v. Montgomery Cty.*, PX-18-2054, 2019

WL 1596992, at *4 (D. Md. Apr. 15, 2019) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742,

761-62 (1998)). But, "[a]bsent evidence that a new position is significantly more stressful than

the last, vague allegations of stress resulting from reassignment cannot support a claim of

discrimination under Title VII." *Boone*, 178 F.3d at 256. At a minimum, the plaintiff must

demonstrate that "the reassignment had some significant detrimental effect on" the employee. *Id.*

To allege the requisite causation under Title VII, the plaintiff must plead that the retaliation

"would not have occurred in the absence of the alleged wrongful action or actions of the

employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *see also Irani*, 767

F. App'x at 421. In other words, Title VII requires the plaintiff to allege that the "protected activity

was a but-for cause of the alleged adverse action by the employer." *Nassar*, 570 U.S. at 362.

Ordinarily, there must exist "some degree of temporal proximity to suggest a causal

connection." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th

Cir. 2005). Therefore, a "'lengthy time lapse between the [defendant's] becoming aware of the

protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal

connection exists between the two.'" *Id.* (citation omitted). Indeed, a lapse of two-and-a-half

months between the protected activity and an adverse employment action "is sufficiently long so

as to weaken significantly the inference of causation," although it does not preclude the plaintiff from establishing causation. *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003).

Regarding his retaliation claim, Mr. Scott alleges that he filed a complaint with the MCCR on March 25, 2016, and "provided his employer written notification and a copy of the complaint." ECF 31, ¶ 96.   Five days after Mr. Scott filed his complaint, on March 30, 2016, he met with Ms. Hafner, Ms. McCloskey, and Ms. Lewis.  ECF 21,  ¶ 98.  During the meeting, defendants allegedly "pressured" Mr. Scott "to drop" his complaint in exchange for "favorable treatment, restoration of his Family Medical Leave and inclusion of a favorable 2015 annual performance evaluation for inclusion into his file."  *Id.*  According to plaintiff, when he refused to abandon his complaint, he was placed on a performance improvement plan.  *Id.* ¶ 99.  Less than a month later, Mr. Scott was terminated due to his alleged failure to comply with the requirements of the plan.  *Id.* ¶ 102.

At this juncture, the allegations suffice to state a claim for retaliation.  Plaintiff's complaint with the MCCR was unquestionably a protected activity.  *See Strothers*, 895 F.3d at 327 (observing that Title VII's anti-retaliation provision applies so long as the employee has an objectively reasonable belief that a Title VII violation has occurred).  And, Mr. Scott claims that defendants knew of the complaint both because he provided them with a copy and because they pressured him to drop the complaint during the meeting of March 30, 2016.  Placement on the improvement plan qualifies as an adverse action, particularly here, where it allegedly resulted in plaintiff's termination. Finally, the temporal proximity between the protected activity and the adverse activity—here just five days—satisfies the causation requirement.  *See Waag v. Sotera Def. Sols., Inc*., 857 F.3d 179, 192 (4th Cir. 2017) (recognizing that "for purposes of establishing a prima facie case, close temporal proximity between activity protected by the statute and an adverse employment action may suffice to demonstrate causation"); *see, e.g*., *Chang Lin v. Azar*, TDC-17-

438, 2020 WL 979087, at *8 (D. Md. Feb. 28, 2020) (one month between protected activity and adverse action satisfied causation requirement at Rule 12(b)(6) stage).

Accordingly, I shall deny the Motion as to Mr. Scott's retaliation claim.

### E.  § 1981 Claim

In relevant part, § 1981 provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory . . . to the full and equal benefit of all laws . . . as is enjoyed by white citizens[.]"  42 U.S.C. § 1981(a).  "Although Section 1981 does not explicitly use the word 'race,' the Supreme Court has construed the statute to ban all racial discrimination in the making of public and private contracts." *Nnadozie v. Genesis Healthcare Corp.*, 730 F. App'x 151, 156 (4th Cir. 2018) (citing *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609 (1987)); *see Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975) ("§ 1981 affords a federal remedy against discrimination . . . on the basis of race.").  Thus, § 1981 bar racial discrimination in the workplace.  *See Yashenko v. Harrah's N.C. Casino Co., LLC*, 446 F.3d 541, 551-52 (4th Cir. 2006).

The analysis under § 1981 tracks that of Title VII.  *See Gairola v. Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985) ("Under Title VII and either § 1981 or § 1983, the elements of the required prima facie case are the same."); *see also Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004) (stating that the *McDonnell Douglas* burden shifting framework, developed for Title VII, has been applied to § 1981 claims).  For the reasons set forth above, plaintiff has not plausibly alleged that he was discriminated against because of his race.  Therefore, plaintiff's § 1981 claim is subject to dismissal, without prejudice.

### F.  Maryland Law claims

In the Amended Complaint, plaintiff alleges that "there are pendent state claims and torts for breach of contract and intentional interrereference with contract and/or economic advantage." ECF 21 at 2.  Defendants move to dismiss these claims, asserting that "Plaintiff's Amended Complaint is devoid of any description of his relationship to the Defendants, what duty or legal obligation they may have owed to him, the specific harm he alleges each of them may have done him . . . ."  ECF 24 at 10.

The Court agrees with defendants that plaintiff's bare-bones assertions of State law violations do not survive Rule 12(b)(6).  Rule 8 of the Federal Rules of Civil Procedure sets forth the "baseline standard to which all complaints must adhere."  *Plumhoff v. Cent. Mortg. Co*., 286 F. Supp. 3d 699, 701 (D. Md. 2017).  Under Rule 8(a), a complaint must "contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). The rule also requires that "[e]ach allegation must be simple, concise, and direct." Fed. R. Civ. P 8(d)(1).  The goal of Rule 8 is to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47-48 (1957).

To be sure, courts must generously construe the pleadings of a self-represented plaintiff. *Erickson*, 551 U.S. at 94. But, "'even pro se litigants [must] state their claims in a[n] understandable and efficient manner.'" *Plumhoff*, 286 F. Supp. 3d at 702 (alterations in *Plumhoff*) (quoting *Stone v. Warfield*, 184 F.R.D. 553, 555 (D. Md. 1999)); se*e also Adam v. Wells Fargo Bank, N.A*., JFM-9-cv-2387, 2010 WL 3001160, at *3 (D. Md. July 28, 2010) ("[T]he leeway extended to a pro se plaintiff must be tempered to require the plaintiff to comply with the Federal Rules of Civil Procedure, including the pleading requirements of Rule 8.").  The court owes the plaintiff no duty to wade through filings in search of viable claims.  *See Plumhoff*, 286 F. Supp.

3d at 702; *see also Mann v. Boatwright*, 477 F.3d 1140, 1148 (10th Cir. 2007) ("It [i]s not the district court's job to stitch together cognizable claims for relief from the wholly deficient pleading that [plaintiff] filed.").

Here, plaintiff does not identify with any specificity what "torts" defendants have committed.  Nor does the Amended Complaint allege that plaintiff had a contract with defendants or explain how defendants' conduct was in breach of that contract.  These omissions are fatal.

Absent factual allegations, the Court cannot assess whether the law entitles the plaintiff to a remedy against the defendants.  *See Iqbal*, 55 U.S. at 678.  Indeed, for that very reason, a pleading that contains only "bare legal conclusions" is "insufficient to state a claim" and must be dismissed under Rule 12(b)(6).  *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 391 (4th Cir. 2011); *see Iqbal*, 55 U.S. at 678 (explaining that neither "labels and conclusions" nor "naked assertion devoid of further factual enhancement" suffice to state a claim) (cleaned up); *Twombly*, 550 U.S. at 544.

Accordingly, because plaintiff's Amended Complaint does not contain factual allegations to support tort or contract claims, I shall dismiss plaintiff's State law claims, without prejudice.

### IV.     The Other Defendants

Plaintiff's initial Complaint and Amended Complaint name Ms. Bennett, Ms. Lewis, and Ms. Hafner as defendants to the suit.  *See* ECF 1; ECF 21.  On August 22, 2019, the Clerk issued summons as to all defendants.  ECF 5.  And, on September 9, 2019, summons were returned executed as to Archbishop Lori, Ms. McCloskey, the Archdiocese, Catholic Charities, and Daily Bread.  ECF 8.  However, summons were unexecuted as to Ms. Bennett, Ms. Lewis, and Ms. Hafner.  ECF 10 (Ms. Lewis); ECF 11 (Ms. Bennett); ECF 14 (Ms. Hafner).  To date, the docket does not reflect that plaintiff has effected service of process on these defendants.  And, according

to the defendants who have been served, Ms. Bennett, Ms. Lewis, and Ms. Hafner are no longer employed at Catholic Charities.  ECF 24 at 2 n.2.

Fed. R. Civ. P. 4(m) requires a plaintiff to serve defendants "within 90 days after the complaint is filed."  If any defendant is not served within that time, "the court . . . must dismiss the action without prejudice against that defendant or order that service be made within a specified time."  *Id.*  Pursuant to Fed. R. Civ. P. 4(m), plaintiff was required to serve Ms. Lewis, Ms. Bennett, and Ms. Hafner by October 13, 2019.

Local Rule 103.8 provides that "the Court may enter an order asking the party to show cause why the claim should not be dismissed" if a plaintiff "has not effected service of process within 90 days" of filing the suit.  The same Local Rule states that "the claim shall be dismissed without prejudice" if the plaintiff fails to show cause within "within fourteen (14) days of the entry of the order or such other time as may be set by the Court."  Local Rule 103.8.

At this point, it appears that plaintiff has abandoned his claims against the individual defendants, because they have not been served.  I shall grant plaintiff until July 24, 2020, to show cause why the claims against Ms. Bennett, Ms. Lewis, and Ms. Hafner should not be dismissed under Fed. R. Civ. P. 4(m) and Local Rule 103.8, without prejudice, for failure to effect service of process.

### V.    Conclusion

For the reasons stated above, I shall grant the Motion (ECF 24) in part and deny it in part. An Order follows, consistent with this Memorandum Opinion.


Date:   July  8, 2020                                    _____/s/_____
                                                        Ellen Lipton Hollander
                                                        United States District Judge

45